Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000545
30-MAY-2014
09:37 AM

NO.   CAAP-11-0000545

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


KELLY ANN CARR, formerly known as
KELLY ANN BUENGER, Plaintiff-Appellant, v.
SOCRATES WILLIAM BUENGER, Defendant-Appellee


APPEAL FROM THE FAMILY COURT OF THE SECOND CIRCUIT
(FC-DIVORCE NO. 05-1-0044)


MEMORANDUM OPINION
(By:  Nakamura, Chief Judge, Leonard and Reifurth, JJ.)


Plaintiff-Appellant Kelly Ann Carr, formerly known as Kelly Ann Buenger (**Mother**), appeals from a Family Court of the Second Circuit's (**Family Court's**) June 16, 2011 post-decree order entitled Court's Order Re:  Parenting Plan and Access Schedule (**Parenting Order**).[1]  Mother also challenges various findings of fact (**FOFs**) and conclusions of law (**COLs**) set forth in the Family Court's October 4, 2011 FOFs and COLs.

I.   BACKGROUND FACTS

Mother and Socrates William Buenger (**Father**) were married on July 27, 2003.  Mother filed a complaint for divorce

---

[1]    The Honorable Keith E. Tanaka presided.

on January 27, 2005.  On October 4, 2006, the Family Court
entered a Judgment Granting Divorce and Awarding Child Custody
(**Divorce Decree**).[2]

The Divorce Decree awarded the parties joint legal
custody of their daughter (**Daughter**).  Mother was awarded primary
physical custody of Daughter, subject to Father's reasonable
right of visitation.  The Divorce Decree further provided:

> Visitation shall be as recommended by Jacque Ford.  Ms. Ford
> shall remain as Guardian Ad Litem for [Daughter] until she
> is dismissed by the Family Court pursuant to a filed
> Stipulated Order between the parties or further order of the
> Family Court, with each party paying half of her fees.

In addition, the Divorce Decree provided for the Family
Court's "continuing jurisdiction and specific authority to make
any other orders it deems appropriate or necessary" to enforce
the decree.

Prior to the entry of the Divorce Decree, Guardian Ad
Litem (**GAL**) Jacque Ford (**Ford**) filed three reports concerning the
parties' then-two-year-old child.  The first report recommended
two hours of visitation, twice a week, to be incrementally
increased to two overnight visits per week, if the increased
visits were deemed "successful" by the GAL, ultimately to be
increased to every Wednesday night with Father, and alternating
weekends with Father, along with a specified holiday/special
occasion schedule, if visitation "goes well."  The second report
memorialized, but then dismissed as mistaken, the GAL's "thought"
that she had detected alcohol on Mother's breath during a visit
by Mother to the GAL's office.  The third report included the
GAL's continuing observations, and reflected a high level of

---

[2]     The Honorable Simone C. Polak presided.

2

monitoring/supervision of Father's visitation (*e.g.* "[GAL] will supervise the last two hours of each of these visits to assure that [Daughter's] needs are being met and that [Father] is able to feed her lunch and put her down for a nap in a satisfactory manner"), but did not in any way criticize or raise doubts concerning Father's parenting[3] or change the initial GAL recommendations.

Although the exact circumstances are unclear (and disputed) it appears that, at some point in late 2006, Ford resigned as GAL.

On July 11, 2008, Father filed *pro se* a motion for post-decree relief requesting the appointment of a child custody evaluator to create a "definitive parenting plan" in light of Ford's resignation and Mother's alleged lack of cooperation. On August 26, 2008, through counsel, Father filed a second motion for post-decree relief, which sought a broader range of relief. On September 8, 2008, Mother filed a motion for post-decree relief seeking, *inter alia*, sole legal custody so that she alone could make the decisions that she believes are in the best interest of Daughter.

On September 19, 2008, a stipulated order was entered for the employment of retired Judge Eric G. Romanchak (**Romanchak**) to mediate "the issues of custody, visitation and other related matters." On September 29, 2008, a stipulated order was entered directing the parties to use Romanchak's services to mediate the issues raised in their motions.

---

[3]     It appears from the third report that Mother was "very concerned" about increased visitation and the GAL felt that it would be desirable if "some of [Mother's] fears [were] allayed."

On March 17, 2009, Father filed a "Memorandum of Law" that, *inter alia*, reported that mediation had not been successful and summarized the parties' requests for relief.

On April 29, 2009, the Family Court entered an order providing, *inter alia*, that Dr. Giuletta Swenson (**Swenson**) would be appointed to serve as GAL, and that Swenson would have the discretion to allow overnight visitation with Father if the GAL opined that it was in Daughter's best interest. On June 22, 2009, the Family Court entered an order providing, *inter alia*, for Father's visitation with Daughter twice a week for eight hours, until further order of the court or an alternative recommendation by Swenson. On June 23, 2009, the order formally appointing Swenson as GAL was entered, which, *inter alia*, again granted Swenson the discretion to allow overnight visits. Swenson filed a report dated October 8, 2009 (**Swenson Report**) and an updated report dated April 14, 2010 (**Swenson Update**). The Family Court held various hearings, and the parties submitted various documents to the court throughout these proceedings, not all of which are chronicled here.

The Swenson Report made no custody recommendation, but stated, *inter alia*, that it was the GAL's opinion that Daughter's time-sharing schedule with Father was behind what it should have been given her age and circumstances and that the primary goal should be working to build up to a developmentally appropriate schedule where Mother, as the "residential parent," has 10/14 overnights and Father, as the "non-residential parent," has 4/14 nights. The GAL included a "feasible" timetable to build up to that by February or March of 2010, assuming Daughter's "normal

4

adjustment" to the transition. The GAL also opined that a "firm holiday schedule" needed to be established and that the parents needed to discuss vacation and potential travel arrangements, including "small vacation periods" with Father 3-4 times per year. The GAL stressed the need for parental cooperation.

The Swenson Update reflected various difficulties, which we will not detail herein. The GAL opined that a formal written Holiday/Access schedule would be of benefit. The GAL further opined that the Family Court needed to hear from each parent concerning the 10/4 schedule, and whether or not it would be in Daughter's best interest to stay with it or expand it. The Swenson Update noted that "parental conflict is high" and that Swenson did not have an effective working relationship with parents. The Swenson Update also recommended parent counseling, a new GAL, re-evaluation of the 10/4 schedule, and resolution of the holiday/access schedule.

In the meantime, following a November 13, 2009 hearing at which the Family Court took "extensive" offerings of proof, evidence, and argument on the parties' various motions, on January 12, 2010, the Family Court entered certain FOFs and COLS (**Interim FOFs/COLs**). The Interim FOFs/COLs resolved numerous financial disputes between the parties. With respect to custody and visitation, the Interim FOFs/COLs's "COLs"[4] included:

> 2. The Decree awarded Mother and Father joint legal custody with primary physical custody to Mother subject to Father's reasonable rights of visitation. Under joint legal custody arrangements, major decisions that affect the child's welfare are made by both parents.
>
> 3. The Decree did not set a visitation schedule and

---

[4] As some of the paragraphs identified as COLs were stated as recommendations, they appear to be advisory in nature.

5

left it up to the GAL recommendation. The Court in granting the divorce should not have delegated its authority to a GAL. Bencomo v. Bencomo, 112 Hawaii 511, 147 P.3d 67 (App. 2006). The failure of the original GAL to implement any type of visitation schedule only added to the litigious nature of this case.

. . . .

17. . . . In considering whether to award joint versus sole legal custody [which was requested by Mother], the Court is concerned about capacities of the parents to communicate constructively with each other with respect to the child's welfare, and the parties' parenting styles.

18. The Family Court concludes that, in the instant case just because the parents are unable to co-parent effectively this is not a material change in circumstance.

19. The Family Court further concludes that it is in the best interest of [Daughter] that Mother and Father have joint legal custody of [Daughter]. Mother shall continue to have primary physical custody of [Daughter], subject to Father's visitation schedule on a 10/4 schedule (10 nights with Mother, 4 nights with Father as also recommended in the [Swenson Report].

20. The Family Court recommends that the 10/4 schedule be utilized for 4 to 6 months with a review date set at the end of that time to revisit how that schedule is working and whether it should be expanded to give Father more visitation time (as also recommended in the [Swenson Report] on October 8, 2009).

. . . .

22. The Family Court recommends that the parents seek the services of Dr. Michael Rim to assist them to communicate constructively and co-parent effectively as joint legal custodians (as also recommended by the GAL).

23. The Family Court recommends that the parents continue to work with the GAL, Dr. Guilietta Swenson to facilitate a visitation schedule/parenting plan in the best interest of the child.

On March 29, 2010, once again without counsel, Father filed a motion seeking clarification of the Interim FOFs/COLs, noting the resignation of Swenson and essentially arguing that a clear time-sharing schedule was needed. Thereafter, Mother's counsel withdrew as well, and Mother filed pro se an opposition to Father's motion. At a June 30, 2010 hearing on Father's motion, the Family Court ordered the parties to attend a co-parenting class run by Sherry Fisher (**Fisher**). During the hearing, Mother expressed familiarity with Fisher, describing her as "incredible" and "really good at what she does." The court's

written order, entered on June 30, 2010, ordered that Fisher would provide a "Report on Mediation/Progress Status" to the court in ten weeks, but did not otherwise rule on Father's motion. This schedule was apparently delayed to allow both parties to complete Fisher's class, although various status hearings appeared to have been called and the matter continued.

It appears that, after both parties completed Fisher's class, they initially agreed (but were not ordered) to "mediation" with Fisher, although it does not appear that the parties necessarily agreed to the scope of the mediation. By the time of a February 16, 2011 hearing, Mother was strongly opposed to mediation with Fisher, apparently because Mother felt that Fisher was "abandoning neutrality" and attempting to insert herself into the litigation. In light of the long history of the conflict between the parties, the court nevertheless ordered them to contact Fisher regarding mediation.

Thereafter, Mother filed two "updates," first reporting that the parties were meeting with Fisher, then reporting that mediation with Fisher had failed. Father also filed an update, agreeing that mediation had failed, but also submitting a report by Fisher entitled "[Daughter] Detailed Therapeutic Assessment" (**Fisher Assessment**).

On April 20, 2011, the Family Court held a status conference, noted that mediation had failed, and set the matter for trial. Both parties filed pre-trial position statements, including their proposed parenting schedules.

On June 3, 2011, the Family Court held an evidentiary hearing and trial on custody and visitation. Both parties

7

appeared *pro se*.  Father sought to present testimony from Fisher.
Mother objected and asked that the Fisher Assessment be stricken
from the record.  The Family Court then called Ms. Fisher into
court,

> not as a witness or anything . . . I want to get it clear on
> the record as far as her capacity, how she was dealing with
> both of you and with [Daughter], and if she is comfortable
> even testifying if she has to testify.  I want to put that
> on the record here.  And then I'll make a decision whether
> or not she should testify.[5]

The Family Court asked Fisher whether, following the
hearing, she would still be willing to work with the parties and
Daughter, if she did or if she did not testify.  Fisher answered
affirmatively.  Upon the court's inquiry, Fisher also confirmed
that it was her opinion that the court needed to set a schedule,
for Daughter's sake.  After Fisher gave her statement, the Family
Court orally denied Mother's request to "strike and seal" the
Fisher Assessment because

> . . . I have read that report, which you have read and both
> of you have read.  Like I said, I don't think she's making
> any recommendations as far as who should have custody or
> what the schedule should be.  She's just making comments as
> far as her concerns, what's happening, you know, between you
> folks and how that's effecting [sic] [Daughter].
>
> And then she's also recommending that, you know,
> because you folks -- she's tried to work out a visitation
> schedule, but it hasn't been successful, which you both know
> you've been trying to do that for years.  She's asking the
> Court to do that.
>
> So, I don't know how I can strike her report if I've
> already read it.  I can't just strike it from my mind.

The Family Court decided that it was not going to allow
Fisher to testify for either side "based upon the Court's
findings here that because she has been working with both parties
and with the child and there may be a possibility she will

---

[5]     Fisher was not under oath at the time she gave her statement.

continue to work with both parties and the child, I don't want to jeopardize that relationship by testifying here[.]"

Mother and Father each presented their case through their own testimony/argument. Father argued for equal parenting time with Daughter in order to reduce parental conflict and to foster a closer relationship with Daughter. Mother stated that she formulated her proposed parenting plan in response to observations by herself and Fisher that Daughter is "feeling very conflicted." Mother's parenting plan included less time with Father than the schedule proposed by Father.

Mother requested to cross-examine Father regarding "some really specific issues," such as why he failed to meet with Daughter's teacher and why he had not taken Daughter to a school event. The Family Court indicated that it did not want to get into a "cross-examination type technique," but allowed Mother to argue that Father is not there for Daughter. In addition, the court made inquiry into the areas raised by Mother.

At the close of the June 3, 2011 evidentiary hearing, the Family Court took the issues of custody and visitation under advisement in order to further review the proposed parenting plans. The Family Court also stated:

> you've been here years already . . . . there's been a lot of conflict, okay. And I think you're both kind of tired of the conflict, and we've tried all kind[s] of different options to resolve the conflict between both of you, whether it's through mediation, whether through professionals, whoever we try to deal with, and you know, whether it's through your attorneys or whatever, it just hasn't worked. And the person that we're kind of losing sight of is [Daughter] and she's the one suffering all this time.
>
> So even though you want me to just not consider Sherry Fisher's report, I think it's evident, and I think you both recognize, that something has to change because [Daughter] is the one suffering here. I think I've already made that clear from the last hearing and that's why I said, well, if you can't do it on your own or with professional help, I'm

just going to have to make a decision for the sake of
[Daughter], because I don't want to see her suffer any more.

. . . .

So I want to look at your schedules here and I want to see
what's best for her. . . .

So I'm going to consider all that. I'm going to consider
all your arguments today. I will review all of the
pleadings again, and I will make a written decision and then
you'll get my written decision.
. . . .

It's what has to be done for [Daughter]. So whether it's
going to be a five two two five schedule, or a ten four
schedule, or even something else all together, I have to
determine what's best for her. But I will consider your
arguments and your position statements.

On June 16, 2011, the Family Court filed its Parenting

Order. Therein, the Family Court ordered that Mother and Father

are to share joint legal and physical custody of Daughter and

provided detailed guidance and specific instructions for

Daughter's regular schedule, holidays, and other non-regular

events, as well as specific steps for conflict resolution,

communications with each other, and other matters related to

Daughter's care and well-being.

On June 27, 2011, Mother filed a motion for

reconsideration of the Parenting Order. On July 1, 2011, the

Family Court denied Mother's motion for reconsideration. Mother

filed a notice of appeal on July 15, 2011. On July 26, 2011,

Mother requested that the Family Court enter FOFs and COLs. On

October 4, 2011, the Family Court entered its final FOFs and

COLs.

II.  POINTS OF ERROR ON APPEAL

Mother raises thirteen points of error, arguing that

the Family Court erred in: (1) failing to strike the Fisher

Assessment; (2) eliciting Fisher's opinion at the June 3, 2011

hearing; (3) relying on Fisher's opinions; (4) entering FOF 63,

10

which found that it was imperative to establish and implement a time-sharing schedule; (5) entering COL 1, which incorporated by reference the Family Court's January 12, 2010 FOFs and COLs; (6) entering COL 3, which concluded that Fisher's report should not be stricken; (7) entering COL 4, regarding the Family Court's decision not to let Mother directly cross-examine Father; (8) awarding Father joint physical custody; (9) entering COL 7, which concluded that Father established a material change of circumstances warranting a modification of physical custody; (10) entering COL 8, which concluded that physical custody of Daughter should be shared equally; (11) establishing the Parenting Plan and Access Schedule in paragraphs I and II of the Parenting Order; (12) establishing mandatory steps to be taken by the parties prior to seeking further court intervention; and (13) entering COL 9, which incorporated the Parenting Order and described the extent to which it did and did not modify the child support, custody, and visitation provisions in the Divorce Decree.

III. APPLICABLE STANDARDS OF REVIEW

> Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Thus, [an appellate court] will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006) (citation omitted). "Furthermore, the burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it." Ek v. Boggs, 102 Hawai'i 289, 294-95, 75 P.3d 1180, 1185-86 (2003) (citations, internal quotation

marks, and brackets omitted).

> The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard. A[n] FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.
>
> On the other hand, the family court's COLs are reviewed on appeal de novo, under the right/wrong standard. COLS, consequently, are not binding upon an appellate court and are freely reviewable for their correctness.
>
> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

Fisher, 111 Hawai'i at 46, 137 P.3d at 360 (citation and ellipses omitted; format altered).

> It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact.

Id. (citation and quotation marks omitted).

> Finally, the Hawai'i Supreme Court has held:
>
> [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

State v. West, 95 Hawai'i 452, 456-57, 24 P.3d 648, 652-53 (2001) (quoting Kealoha v. Cnty. of Hawaii, 74 Haw. 308, 319-20, 844 P.2d 670, 676 (1993)).

IV. DISCUSSION

Before addressing Mother's list of alleged errors, it is important to consider the fundamental facts of this case and the paramount legal principles that guide the courts in these

situations.

At its core, this case is about a little girl whose divorced parents seem to have been in a continuous, perhaps constant, state of conflict about matters, great and small, concerning her care and upbringing, since she was two-years-old and possibly earlier.  Despite the assistance of GALS, counselors and therapists of various kinds, classes, mediation, and the efforts of the Family Court, these two parents appear to have prioritized bolstering and defending their respective rights and positions over working together, communicating nicely with one another, and/or understanding and forgiving each other's differences, imperfections, and/or transgressions, for the sake of Daughter.  Courts are generally ill-equipped to truly resolve these sorts of issues, but must nevertheless make decisions concerning custody, visitation, and other parenting-related issues in accordance with the applicable constitutional parameters, statutes, rules, precedent, and the evidence presented to the court.  With that, we turn to Mother's arguments on appeal.

A.   Sherry Fisher

Mother asserts that the Family Court erred in failing to strike Fisher's report, eliciting Fisher's opinion at the June 3, 2011 hearing, and relying on Fisher's opinions.

Fisher's role in this case was not clearly defined, and Fisher often possessed multiple, conflicting roles with respect to her involvement with Daughter and the parties.[6]  The Family

---

[6]     The Fisher Assessment indicates that Mother initiated the assessment of Daughter with Fisher so that Daughter "had an 'advocate.'"  The
(continued...)

13

Court ordered the parties to attend Fisher's co-parenting class; however, the Family Court did not appoint Fisher as a GAL in the case, nor did the Family Court appoint Fisher as a child custody evaluator or mediator. The Family Court did, however, allow the parties to enlist Fisher to "help you as far as further than just the program itself. If you want to use her as a family counselor, that's fine too." The parties later independently engaged Fisher for therapy and/or counseling sessions, as well as for mediation. Although Fisher's report mentions the individual sessions she had with Mother and/or Father, and notes the co-parenting group sessions as part of a "treatment overview" for Daughter, no particular child custody or time-sharing arrangement was recommended; rather, Fisher's report emphasized and concluded that Daughter was being adversely impacted by the ongoing conflicts between her parents and that it was important that some time-sharing arrangement be determined and for the litigation to end.

The Family Court clearly erred, at the June 3, 2011 hearing, when the court solicited Fisher's unsworn opinion that the court needed to set a parenting schedule, for Daughter's sake, yet refused to allow Father to call her as a witness or to allow Mother to cross-examine her. We are aware of no legal basis for such action, notwithstanding the broad discretion given

---

[6](...continued)
Fisher Assessment explains that Mother was verbally given information on the scope of services and changes in confidentiality upon entering Fisher's private practice, and that both Mother and Father agreed to have Fisher "act as advocate for their child, assess her, and act as the mediator for their family[.]" The Fisher Assessment also states that Fisher met individually with Mother and covered consent to services, scope of services, details of confidentiality, and fees, and that Mother "consented to participation in services for herself and [Daughter] by signing documentation[.]" No such documentation or confidentiality agreement appears in the record on appeal.

14

to family courts regarding the examination of reports concerning a child's care, custody, and welfare. See In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001). The Family Court similarly erred to the extent that it relied on Fisher's opinions, which were stated in Fisher's report and "confirmed" at the June 3, 2011 hearing.[7]

Nevertheless, our review of the entire record of these proceedings leads us to conclude that the Family Court's consideration of Fisher's opinion was harmless error. See Hawaii Rules of Evidence (**HRE**) Rule 103(a) (Supp. 2013) ("[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"). First, neither party was prejudiced because, as Mother acknowledged in her opening brief, Fisher's report "did not recommend any particular child custody or timesharing arrangement." More importantly, the record of this case overwhelmingly demonstrates the parties' inability to establish and implement a long-range time-sharing arrangement, as well as their inability to end the ongoing conflict between them, without a specific parenting plan and access schedule. The Family Court's decision to specifically address the custody and visitation issues affecting Daughter was also clearly necessitated by the Divorce Decree's delegation of the Family Court's decision-making authority concerning visitation to GAL Ford. As the Family Court correctly determined in the Interim FOFs/COLs, this delegation was both unauthorized and problematic. As the Family Court concluded: "The Court in

_____

[7] Accordingly, we need not address each of Mother's alternative arguments that Fisher's opinion constituted error.

15

granting the divorce should not have delegated its authority to a GAL. . . . The failure of the original GAL to implement any type of visitation schedule only added to the litigious nature of this case." (Citation omitted); see Bencomo v. Bencomo, 112 Hawai'i 511, 515, 147 P.3d 67, 71 (App. 2006) ("[i]n a divorce case, the family court is not authorized by statute or otherwise to delegate its decision-making authority to a guardian ad litem").

B. COL 1

We reject Mother's contention that the Family Court erred, in COL 1, by incorporating by reference the Interim FOFs/COLs. In conjunction with the November 13, 2009 hearing, the Family Court admitted nineteen of Mother's exhibits into evidence, including a copy of the parties' Divorce Decree, and other evidence relating to child support, uninsured medical costs incurred on behalf of Daughter, the removal of GAL Ford from the case, and conversations between Mother and Father regarding a visitation schedule. The Family Court's Interim FOFs/COLs entered on January 12, 2010, gave an introduction and background of the parties and the litigation.[8] The Family Court then articulated its findings of fact naming the parties, Daughter, and discussing the Divorce Decree. Further findings of the Family Court detailed uninsured medical costs of Daughter

---

[8] The January 12, 2010 Interim FOFs/COLs indicated that the Family Court carefully considered "all the evidence presented and admitted at the November 13, 2009 hearing, and . . . the credible evidence before the Court and the records and files herein" in articulating its Interim FOFs/COLs. The Family Court also indicated that it reviewed Mother's proposed findings of fact and conclusions of law, Father's proposed findings of fact and conclusions of law, and Mother's response in entering its Interim FOFs/COLs.

16

incurred by Mother, and Father's child support arrearages. There is sufficient support for these findings in the exhibits admitted into evidence at the hearing. With regard to legal and physical custody, the Family Court found:

27. Both Mother and Father are loving, caring parents who intend to support the needs of [Daughter].
28. On September 4, 2008, Mother filed her Motion for Post-Decree Relief, seeking, among other things, sole legal custody of [Daughter].
29. On March 17, 2009 Father filed a Memorandum in support of his motions and in opposition to Plaintiff's motions. Also on March 17, 2009, Father filed his affidavit in response to the motions mentioned above.
30. On October 14, 2009, all parties and their counsel appeared before the Honorable KEITH E. TANAKA for a Family Court Rule 16 conference regarding all pending matters.
31. On November 13, 2009, Father's August 26, 2008 motion, Mother's September 4, 2008 motion, and Mother's February 17, 2009 motion came on for hearing before the Honorable Keith E. Tanaka. At the hearing, Mother and Father made extensive offerings of proof. The Court also received Mother's nineteen exhibits into evidence.

Based on a review of the evidence admitted at trial, the parties' other filings with the Family Court, the statements made at the November 13, 2009 hearing, and other documents and reports in the record, it appears that all of the Family Court's findings are supported by substantial evidence in the record. Accordingly, Mother's contention that the Family Court erred in entering COL 1 is without merit.

C.    Cross-examination of Father

Mother contends that the Family Court erred when it declined to allow Mother, who was appearing *pro se*, to cross-examine Father, who was also *pro se*. Mother wanted to question Father under oath in regard to what she claimed was his lack of involvement and parental disinterest when Daughter was in his

care. The Family Court denied Mother's request, stating that "instead of going into a cross-examine type technique here, since I'm just allowing you folks to argue here, you can make your point." Mother then proceeded to argue what she perceived as Father's involvement, or rather lack thereof, in Daughter's schooling and medical care, his failure to pay child support payments, etc.

"[T]he family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." In re Jane Doe, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) (citations and internal quotation marks omitted). The appellate court will not disturb the family court's decision "unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant, and its decision clearly exceeded the bounds of reason." Id. Moreover, "[c]ourts have inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them." Doe v. Doe, 98 Hawai'i 144, 154-55, 44 P.3d 1085, 1095-96 (2002) (citation and internal quotation marks omitted). Accordingly, discretion resides within a trial court to determine the scope and extent, if any, of cross-examination. See, e.g., HRE Rule 611 (1993) (vesting discretion in the trial court to control the proceedings before it); HRE Rule 1101 (1993) (stating that the HRE "apply to all courts of the State of Hawaii," including therefore, the family courts). This discretion is limited by the requirement that a court

> exercise reasonable control over the mode and order of
> interrogating witnesses and presenting evidence so as to (1)
> make interrogation and presentation effective for the
> ascertainment of the truth, (2) avoid needless consumption
> of time, and (3) protect witnesses from harassment or undue
> embarrassment.

Doe v. Doe, 98 Hawai'i at 155, 44 P.3d at 1096 (footnote

omitted).

Here, Mother's stated purpose for attempting to cross-

examine Father under oath was to establish her factual

allegations of his lack of involvement and parental disinterest

when Daughter was in his care. On appeal, Mother contends that

she was prejudiced by the inability to cross-examine Father

because she was not able to

> more fully bolster her contention that Father was not
> involved in Daughter's care and supervision during those
> times when she was with him, that he was generally
> disinterested in parenting, and that increasing his time
> with Daughter, with a corresponding decrease in the time
> Daughter spent with her, would not be beneficial to
> Daughter, evidently impaired her ability to develop the
> evidence in her favor in regard to this critical aspect of
> the case.

However, it is not clear how Mother would have been

able to further bolster her argument by cross-examining Father

because the same evidence was already established through other

means. As recognized by the Family Court, Mother's stated intent

was to "reiterat[e] what's already in [her] position statement."

Although it appears that the Family Court erred in completely

disallowing cross-examination, Mother's inability to cross-

examine Father was not prejudicial to Mother's case because she

nevertheless retained the ability to set forth her observations

and opinions, present evidence in support of her position,

respond to Father's arguments, and respond to the evidence being

presented against her. See In re Doe, 100 Hawai'i 335, 346 n.23, 60 P.3d 285, 296 n.23 (2002)("The exclusion of testimony is harmless where the same evidence is established through other means.")(citing Kekua v. Kaiser Found. Hosp., 61 Haw. 208, 221, 601 P.2d 364, 372 (1979)).

In addition, the Family Court's ruling essentially adopted the factual allegations that Mother attempted to establish by cross-examining Father. Namely, the Family Court entered the following FOFs in its October 4, 2011 FOFs and COLs:

> 67. Father was relatively uninvolved in [D]aughter's school activities, and rarely, if ever, attended parent-teacher conferences or scheduled events related to [D]aughter's school enrollment and/or attendance.
> 68. Father's relative lack of involvement in [D]aughter's school activities resulted from the fact that:
> . . . .
> (c) He did not invest the time or attention that would have been required on his part to have a greater level of involvement in [D]aughter's school activities.
> 69. Mother was the parent who routinely took [D]aughter to appointments with her doctor and dentist, and Father rarely, if ever, was involved in [D]aughter's medical care.

Thus, it appears that Mother successfully established the same allegations by other means, without cross-examining Father.

Accordingly, any error in the Family Court's ruling to prevent Mother from employing a cross-examination type of technique to directly confront Father on his purported shortcomings as a parent was harmless error.

D. The Family Court's Custody Rulings

Mother's remaining contentions include that the Family Court erred in: concluding that Father had established a material change of circumstances warranting a modification of the custody of Daughter awarded in the Divorce Decree; concluding

20

that physical custody of Daughter should be shared equally; establishing the Parenting Plan and Access Schedule in paragraphs I and II of the Parenting Order; establishing mandatory steps to be taken by the parties prior to seeking further court intervention; and entering COL 9, which incorporated the Parenting Order and described the extent to which it did and did not modify the child support, custody, and visitation provisions in the Divorce Decree.

Hawaii Revised Statutes (**HRS**) § 571-46(a)(6) (Supp. 2013) provides that "[a]ny custody award shall be subject to modification or change whenever the best interests of the child require or justify the modification or change[.]"[9] As the Family Court recognized, this court has previously held that "[t]o obtain the family court's change of a custody order, the movant 'must show a material change of circumstances since the previous custody order, and must show that such a change of custody is in the best interest of the child.'" Egger v. Egger, 112 Hawai'i 312, 318, 145 P.3d 855, 861 (App. 2006) (quoting Nadeau v. Nadeau, 10 Haw. App. 111, 121, 861 P.2d 754, 759 (1993)).

It is evident from the Family Court's FOFs and COLs (and the entire record in this case) that the extraordinarily high level of conflict between these parents, notwithstanding the

---

[9] In determining what constitutes the "best interest of the child," the court is further guided by the principles articulated in HRS § 571-46(b), and include, *inter alia*, the "overall quality of the parent-child relationship," the "history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation," "[e]ach parent's cooperation in developing and implementing a plan to meet the child's ongoing needs, interests, and schedule," and the "areas and levels of conflict present within the family."

many attempts to encourage and/or aid the parties through mediation, professional services, and prior court orders, qualified as a material change in circumstances sufficient to warrant the Family Court's consideration of a change in the original custody and visitation terms in the Divorce Decree. This is particularly true in light of the lack of specificity and clarity in the original custody and visitation provisions, which improperly delegated the time-sharing arrangements between the parents to a GAL, and the evolving and changing arrangements that were implemented thereafter. We conclude that the Family Court did not err in determining that these circumstances, and the best interests of Daughter, warranted consideration of all of the circumstances of the parties and Daughter in crafting a modified custody order.

We further conclude that, under the facts and circumstances of this case, the Family Court did not abuse its discretion in establishing the detailed Parenting Plan and Access Schedule, which included equal physical custody and a mandatory dispute resolution regimen. A family court is statutorily-required to base its determination on the best interests of the child. HRS § 571-46 ("Custody should be awarded to either parent or to both parents according to the best interests of the child[.]"); Fujikane v. Fujikane, 61 Haw. 352, 354, 604 P.2d 43, 45 (1979) ("[t]he critical question to be resolved in any custody proceeding is what action will be in the best interests of the child" (citing Turoff v. Turoff, 56 Haw. 51, 55, 527 P.2d 1275, 1278 (1974))); see also HRS § 571-46.5 (2006) (re parenting

plans).

HRS § 571-46(b) sets forth a non-exclusive list of factors that the Family Court may consider when determining what constitutes the best interests of the child in the context of custody awards, including modification of custody awards. HRS §§ 571-46(a)(6), 571-46(b). These factors include, *inter alia*: "(3) The overall quality of the parent-child relationship;" "(7) The emotional needs of the child;" "(9) The educational needs of the child;" "(10) The child's need for relationships with siblings;" "(11) Each parent's actions demonstrating that they allow the child to maintain family connections through family events and activities;" "(12) Each parent's actions demonstrating that they separate the child's needs from the parent's needs;" and "(15) The areas and levels of conflict present within the family[.]" HRS § 571-46(b). The record reflects the parties' submissions, representations, and arguments concerning these and other factors affecting Daughter's bests interests, as well as the report and recommendations of GAL Swenson, all of which appear to have been taken into consideration in the Family Court's shaping of the June 16, 2011 Parenting Order, as well as the October 4, 2011 FOFs and COLs. Upon careful review, we find no abuse of discretion in the Family Court's formulation of the terms of the Parenting Order.

## V.    CONCLUSION

For these reasons, the Family Court's June 16, 2011 Parenting Order is affirmed.

DATED:   Honolulu, Hawai'i, May 30, 2014.

On the briefs:

Peter Van Name Esser
(& Robert M. Harris, deceased)
for Plaintiff-Appellant
Kelly Ann Carr

Chief Judge


Socrates William Buenger
Defendant-Appellee Pro Se

Associate Judge


Associate Judge

24